No. 2-21-0423
Opinion filed December 18, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) )  ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09-CF-505 |
| ZACHARY REYES, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justice McLaren concurred in the judgment and opinion.
Justice Birkett concurred in part and dissented in part, with opinion.

## OPINION

¶ 1    In 2012, a jury convicted defendant, Zachary Reyes, of one count of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) and two counts of attempted murder with a firearm (*id.* §§ 8-4(a), 9-1(a)(1)), all committed during a single incident when he was 16 years old. Although the trial court sentenced defendant to the minimum sentence possible on each count, the law required add-ons for his use of a firearm and also required the sentences to run consecutively, with the result that defendant's sentence was a mandatory minimum of 97 years' imprisonment, which we affirmed. *People v. Reyes*, 2015 IL App (2d) 120471, ¶ 23. Our supreme court ultimately determined that defendant's sentence was an unconstitutional mandatory *de facto* life sentence and remanded for a new sentencing hearing. *People v. Reyes*, 2016 IL 119271, ¶ 9.

¶ 2    On remand, the trial court sentenced defendant to 66 years' imprisonment. Defendant appealed, and we vacated defendant's sentence and remanded to the trial court for resentencing, finding that the sentence did not comply with the requirements for sentencing a defendant who committed his crimes while he was a minor, as set out by the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012), and the Illinois Supreme Court's decision in *People v. Holman*, 2017 IL 120655.

¶ 3    On remand, the trial court once again sentenced defendant to 66 years' imprisonment. Defendant again appealed, arguing that the trial court violated our mandate as well as the federal and state constitutions by imposing a *de facto* life sentence without finding that he was permanently incorrigible under *Holman*. He also argued that, even if the trial court was not required to make such a finding, the trial court relied on improper factors in determining his sentence. We initially agreed with defendant that the trial court relied on improper factors in determining his sentence and remanded for resentencing. *People v. Reyes*, 2023 IL App (2d) 210423. Our supreme court denied the State's petition for leave to appeal but entered a supervisory order instructing that we vacate our previous opinion and consider whether its decision in *People v. Wilson*, 2023 IL 127666, required a different outcome. After the parties submitted supplemental briefs addressing *Wilson*, we held the case in abeyance pending our supreme court's decision in *People v. Class*, 2025 IL 129695. Having already vacated our prior judgment, we now consider the matter in light of *Wilson* and *Class* and determine that the same result is warranted. We therefore vacate defendant's sentence and remand for resentencing.

¶ 4                                    I. BACKGROUND

¶ 5                                 A. Original Proceedings

¶ 6    In 2010, defendant was charged with the first degree murder of Jason Ventura and the attempted murders of Eduardo Gaytan and Jorge Ruiz. The indictment alleged that on December

20, 2009, defendant personally discharged a firearm in the direction of a vehicle occupied by Ventura, Gaytan, and Ruiz and that defendant's actions caused the death of Ventura, as well as serious injury to Gaytan. Defendant, who was 16 years old at the time of the shootings, was prosecuted as an adult. See 705 ILCS 405/5-130(1)(a)(i) (West 2008). Defendant was found guilty of the charged offenses after a jury trial.

¶ 7       The trial court imposed the mandatory minimum sentence of 45 years' imprisonment for the first degree murder conviction, consisting of the minimum 20-year sentence for murder (see 730 ILCS 5/5-4.5-20(a) (West 2008)) plus a 25-year mandatory firearm enhancement (*id.* § 5-8-1(a)(1)(d)(iii)). The court also sentenced defendant to 26 years' imprisonment on each of the two convictions of attempted murder: the minimum 6-year sentence for attempted murder (see *id.* § 5-4.5-25(a)) plus the 20-year mandatory firearm enhancement (*id.* § 5-8-1(a)(1)(d)(ii)). In addition, as required by statute (see *id.* § 5-8-4(d)(1)), the trial court found that all of defendant's sentences must run consecutively. As a result, defendant was sentenced to a mandatory minimum aggregate sentence of 97 years' imprisonment.

¶ 8       Defendant appealed, arguing in part that his sentence was unconstitutional pursuant to *Miller*, 567 U.S. at 479, in which the United States Supreme Court held that a sentencing scheme that mandated a sentence of natural life in prison without the possibility of parole for juvenile offenders violated the eighth amendment of the federal constitution (U.S. Const., amend. VIII). See *Reyes*, 2015 IL App (2d) 120471, ¶ 16. Defendant argued that his aggregate term-of-years sentence was a *de facto* mandatory natural life term of imprisonment and was likewise unconstitutional under *Miller*. *Id.* The Illinois Supreme Court agreed with this argument. *Reyes*, 2016 IL 119271, ¶ 9. The court concluded that defendant's *de facto* life sentence constituted cruel and unusual punishment in violation of the eighth amendment and therefore vacated his sentence (*id.* ¶ 10) and remanded the case for resentencing (*id.* ¶ 12).

¶ 9     In its ruling, the court noted that, while defendant's appeal was pending, the legislature had enacted a new law, codified at section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2018)), that (1) required a court sentencing a juvenile offender to take into account several mitigating factors in determining the appropriate sentence and (2) made the imposition of firearm enhancements on a juvenile offender a matter of discretion. *Reyes*, 2016 IL 119271, ¶ 11. The court held that defendant should be resentenced in accordance with the new statute. *Id.* ¶ 12.

¶ 10                              B. First Resentencing

¶ 11     On remand, the trial court ordered a new presentence investigation report (PSI) and, at defendant's request, psychological testing. In September 2017, defendant underwent an evaluation of his mental health and intellectual abilities. The report from that evaluation indicated that defendant received special education accommodations in school from 2002 to 2009. During that time, he suffered from attention-deficit/hyperactivity disorder (ADHD) and took medication for that condition. ADHD caused problems with inattention and impulsivity but was not classified as an intellectual disability. When defendant took his medication, he showed marked progress in his academic functioning. However, in seventh and eighth grade defendant stopped taking his medication and exhibited behavioral issues as a result. In seventh grade, he was suspended for gang-related writing. On a General Ability Index (GAI) evaluation, which the report indicated "represent[ed] a reliable and valid estimate of his overall intellectual ability," defendant scored in the tenth percentile, which indicated that he was in the low average range of functioning. The report noted that, despite defendant's ADHD and low GAI score, he did not meet the criteria for intellectual disability as defined by section 5-1-13 of the Code (730 ILCS 5/5-1-13 (West 2016)).

¶ 12     The 2017 PSI indicated that, before the charges in this case, defendant's juvenile record consisted of one charge of unlawful possession of a firearm without a valid firearm owner's

identification card. At the time of his arrest, he was in the ninth grade at East Aurora High School. Since he had been incarcerated, he had taken classes and earned numerous certificates in, *e.g.,* roofing, insulation, and vinyl decking. He had also earned an antiviolence awareness certificate and had attended Bible study classes. The report indicated that his parents never married and his father did not play an active role in his life. He grew up at home with his mother and with four half-siblings. He described his relationship with his half-siblings as "good." Defendant became involved with the Latin Kings street gang when he was 13 or 14 years old. He expressed remorse for his offenses and specifically for the death of Ventura.

¶ 13    According to the PSI, a "Level of Service Inventory-Revised" (LSI-R) was administered to predict defendant's risk to reoffend, based on the factors and details that were relevant to him at the time of the offenses, December 20, 2009. According to defendant's LSI-R, he was a medium risk for recidivism at the time of the commission of the offenses. The PSI also noted that, at the time of his arrest in December 2009, defendant was on probation for his previous juvenile charge of unlawful possession of a weapon. Based on that, the PSI stated that defendant's attitude was supportive of crime.

¶ 14    An addendum to the PSI included a written statement from defendant, expressing remorse for the shooting and stating that he took full responsibility for his actions. Defendant added that, while incarcerated, he had been taking classes because he wanted to learn and become a better person. On the night of the shooting, older members of the Latin Kings had taken advantage of him because he wanted to be liked, had low self-esteem, and did not know how to refuse them when they asked him to shoot.

¶ 15    At the second sentencing hearing, the State submitted two disciplinary reports for defendant from the Menard Correctional Center, from July 2012 and May 2014. Both disciplinary tickets were for possession of contraband: one for having a weapon (a piece of metal that had a

hook on one end) and one for literature related to the Latin Kings (the Latin Kings "Holy Prayer" and "Code of Kingdom"). The State also submitted an April 2016 affidavit from defendant, which had been filed in a different Kendall County case against a codefendant, Francisco Salazar. In the affidavit, defendant admitted to receiving the gun used in the shooting from higher ranking members of the Latin Kings and firing all the shots into Ventura's car based on orders from the higher-ranking gang members. Defendant also claimed that Salazar was not aware of the gun or the plan. This differed from defendant's testimony at his own trial, where he had testified that he was not the one who fired the shots towards Ventura's car.

¶ 16    Defendant submitted his school records, which showed that he had an Individual Education Plan (IEP) and was in the ninth grade at age 16. Defendant's mother testified that defendant had had an IEP since first grade. He was ultimately diagnosed with ADHD. Defendant always scored below average and was considered learning disabled. He struggled socially and did not have many friends. Defendant's mother testified that the other people involved in the crime were not people with whom he normally associated. On cross-examination, defendant's mother acknowledged that his problems in school were also related to his behavior and that his behavior problems were the main reason he was placed in special schools. She was not aware that defendant's IEP reports indicated that he had gang affiliations as early as 2007.

¶ 17    After the sentencing hearing, the trial court sentenced defendant to prison for 66 years: 25 years on the first degree murder conviction, plus a 25-year firearm add-on; 10 years for the attempted murder of Gaytan but, as permitted by the new sentencing law for juveniles, the trial court exercised its discretion not to apply the "mandatory" firearm enhancement; and 6 years for the attempted murder of Ruiz, again without the firearm enhancement. All sentences were to run consecutively.

¶ 18    Defendant appealed, arguing that the trial court abused its discretion in sentencing him to a 66-year *de facto* life sentence without adequately considering his youth and attendant circumstances. Defendant's challenge to his sentence was based on *Miller* and *Holman*. We vacated defendant's sentence and remanded for resentencing with the following comments:

> "In this case, the trial court imposed a *de facto* life sentence on the defendant, but the record does not reflect a determination by the trial court that the defendant was among the rarest of juvenile offenders whose 'conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.' [*Holman*, 2017 IL 120655,] ¶ 46. *** On remand, the trial court could once again impose a *de facto* life sentence *only* if it determines that the defendant is beyond rehabilitation." (Emphasis in original.) *People v. Reyes*, 2020 IL App (2d) 180237, ¶ 32.

¶ 19                                    C. 2021 Resentencing

¶ 20    On remand, a third judge presided over the sentencing hearing and pronounced sentence. In aggravation, the State presented the same evidence presented at the 2018 sentencing hearing, along with a new witness, Kellie Vanderlei, who prepared a 2021 update to the PSI. She testified that, according to the Adult Risk Assessment she administered to defendant, he had a high risk of recidivism due to his "high level of need" in the areas of education, employment, financial situation, neighborhood problems, and peer association, all assessed as of the time of his 2009 arrest. On cross-examination, she explained that the assessment was substantially affected by defendant's young age when he was arrested. For instance, he was supported by his mother and was not able to support himself. (The PSI update noted that the only employment he had ever had was after he was incarcerated.) If he had had more education or had lived in a less dangerous neighborhood, the assessment would have rated him as a lower risk for recidivism.

¶ 21    As mitigation, in addition to the 2018 sentencing hearing evidence, defendant presented (1) school records showing that he needed special education services because of his learning disability and low average intelligence and abilities and (2) numerous certificates he had earned in the classes he had taken in prison. Three witnesses—his brother and two middle school teachers—testified to defendant's childhood experiences. They testified that defendant was picked on because he was "slow" and that he was vulnerable to recruitment by a street gang because he longed to be "cool."

¶ 22    The 2021 PSI update noted that defendant had worked in the kitchen at the Menard correctional facility and in the cell house and kitchen at Pontiac. He had incurred two additional disciplinary infractions in 2019. One was for fighting: defendant explained that an inmate at Menard had ordered him to kill another inmate, and when defendant refused, the inmate fought with him. After that, defendant had been placed in protective custody and then transferred to Pontiac. The other infraction was for stealing. Defendant said that a supervisor who did not like him had written him up for stealing ice. Generally, however, he reported that he was able to develop a rapport with the correctional facility staff and had not been in trouble with them, and Vanderlei observed that this was borne out by defendant's comfortable interactions with the guards prior to the interview. Finally, defendant submitted a new written statement in allocution, in which he expressed remorse and guilt for killing Ventura, saying that it was an impulsive act committed at the behest of other gang members.

¶ 23    The trial court again sentenced defendant to 66 years' imprisonment, consisting of the same components as before. It issued a written decision that began by listing the things the court was required to consider and stating that it had considered all of them. After recounting the circumstances of the shooting as established at trial, the trial court considered factors in mitigation and aggravation. The trial court stated that none of the factors listed in the general mitigation

statute, section 5-5-3.1 of the Code (730 ILCS 5/5-5-3.1 (West 2018)), applied to defendant. It expressly noted that subsection (13)—intellectual disability—did not apply, as the 2017 examination had concluded that defendant did not meet the statutory definition for intellectual disability. See *id.* § 5-5-3.1(a)(13).

¶ 24    The trial court then considered the additional mitigating factors listed in section 5-4.5-105 of the Code (*id.* § 5-4.5-105), the youth sentencing provision enacted by the General Assembly in the wake of *Miller*. That provision requires that, when a trial court sentences someone for an offense committed when the person was not yet 18 years old, the court must "consider the following additional factors in mitigation in determining the appropriate sentence":

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses

not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.*

¶ 25    Regarding the first factor, the defendant's "age, impetuosity, and level of maturity at the time of the offense," including the ability to consider the risks and consequences of his behavior and any cognitive or developmental disability, the trial court noted that defendant's chronological age at the time of the offense was 16. However, four years earlier in 2005, an intelligence test had found that defendant was "about two years behind where he should have been age-wise." The trial court noted that defendant had ADHD but was able to function "remarkably well" at school when he took medication. Defendant stopped taking medication in middle school (he stated that this was because his mother could no longer obtain it) and became attracted to a gang. The trial court noted that, "[f]rom the records admitted into evidence and the testimony at the sentencing hearing, there is evidence of impetuosity—that the defendant would act impulsively, and suffer adverse consequences for such acts." Additionally, defendant was in the low average range of intelligence. Nevertheless, the trial court found that there was "nothing to indicate that the defendant lacked the ability to consider the risks and consequences of his behavior." The trial court found that this first statutory factor weighed slightly in favor of imposing a lower sentence.

¶ 26    As to the second factor, outside pressure, the trial court found that defendant was "subject to peer pressure and negative influences by virtue of his association with members of the Latin Kings street gang," and thus this factor also weighed slightly in favor of a lower sentence. The third factor, family environment, was not mitigating, as defendant's home environment appeared relatively stable and supportive. There was evidence that defendant had the potential for rehabilitation, as he had completed several classes while in custody, and this fourth factor also weighed in favor of a lesser sentence.

¶ 27    The trial court found that the circumstances of the offense were not mitigating, nor was there anything mitigating about defendant's degree of participation in the offense. Accordingly, the fifth and sixth factors did not apply. Similarly, the seventh factor did not apply, as defendant was able to participate meaningfully in his defense. Defendant had some criminal history, including the possession of a gun and threatening another student at school, so this factor was not mitigating.

¶ 28    The final youth-sentencing factor allows a trial court to consider, as a mitigating factor, anything else it finds relevant. *Id.* § 5-4.5-105(a)(9). The trial court reviewed the 2021 PSI update, which included information on the two additional disciplinary infractions committed by defendant in 2019. The trial court also specifically noted that the Adult Risk Assessment rated defendant as a high risk for recidivism, which was "different from the prior LSI-R Assessment indicating a medium risk to re-offend." Defendant had written several statements accepting responsibility for Ventura's murder and expressing remorse, but the trial court noted that, in his initial written statement in allocution made in 2012, defendant had said that there was "no type of plan or target to kill Jason Ventura and shoot at his friends but the disrespect came from them *** first." The trial court disapprovingly observed that this attempt to justify the shooting did not "truly indicate remorsefulness for one's crime." (Although the trial court presumably also read defendant's later statements of remorse at his more recent sentencing hearings, both of which show more acceptance of responsibility and do not blame the victim, the trial court did not comment on them.) The trial court also highlighted defendant's 2016 affidavit in which he took sole responsibility for the shooting (contrary to his testimony at trial) in an effort to exculpate Salazar and commented that it did not find the affidavit credible. Considering all of this under the "anything else" factor, the trial court did not find that factor to weigh in favor of a lesser sentence.

¶ 29 The trial court then turned to the factors in the general aggravation statute, section 5-5-3.2 of the Code (*id.* § 5-5-3.2). It noted that most of them were not applicable, commenting only on the first, third, seventh, and fifteenth factors:

"(1) The defendant's conduct caused or threatened serious harm. This almost goes without saying, given the nature of these crimes. However, I do give this factor great weight.

(3) The defendant has a history of prior delinquency or criminal activity. While this is true, I have not placed great weight on this factor.

(7) The sentence is necessary to deter others from committing the same crime. While this is true in almost all instances, it is particularly appropriate here as gun violence has no place in our communities or society. Killing one person and attempting to kill two others because you think you were disrespected is unacceptable. Again, this is a factor to which I give great weight.

(15) The defendant committed an offense related to the activities of an organized gang. The evidence at trial is that the events of December 19-20, 2009 were related to an organized gang activity, and I give this factor substantial weight as well."

¶ 30 The trial court then stated that, in selecting a sentence, it had considered the prior appeals in the case and the case law relevant to the sentencing of young offenders, including the Illinois Supreme Court's decisions in *Holman* and *People v. Buffer*, 2019 IL 122327, and the United States Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551 (2005), *Miller*, *Montgomery v. Louisiana*, 577 U.S. 190 (2016), and *Jones v. Mississippi*, 593 U.S. 98 (2021). The trial court relied particularly on *Jones*, in which the United States Supreme Court stated that *Miller* and *Montgomery*, while recognizing the special characteristics of youth that made mandatory sentences of life without parole unacceptable under the eighth amendment, nevertheless permitted the

imposition of such sentences so long as the sentencing judge had discretion to consider the mitigating qualities of youth. *Jones* also held that the eighth amendment did not require a sentencing judge, before imposing such a sentence, to make a separate factual finding that the young offender was permanently incorrigible. The trial court emphasized this holding when declining to make a determination that defendant was permanently incorrigible.

¶ 31    Before pronouncing sentence, the trial court stated that it would have preferred to give defendant an even longer sentence than he had previously received, but it was prevented from doing so by section 5-5-4 of the Code (730 ILCS 5/5-5-4 (West 2018)), which bars a resentencing court from imposing a more severe sentence than the defendant initially received, unless the greater sentence is based on conduct occurring after the original sentencing:

"The nature of these crimes and the facts and the circumstances as presented at trial most likely would have [led] me to impose a greater sentence for the offense of First Degree Murder, had I been assigned this case at the time of the first re-sentencing hearing. However, I am mindful that I am prohibited from doing so by statute at this time."

The court then imposed the same sentence on defendant that was imposed at his second sentencing. For first degree murder, the sentence was 25 years plus a 25-year firearm add-on, for a total of 50 years' imprisonment, all of which must be served. On the two attempted murder convictions, defendant again received 10 years on one and 6 years on the other, both without the firearm enhancement. On those two counts, the law required that at least 85% of the sentence be served. All sentences were to run consecutively, resulting in a total sentence of 66 years.

¶ 32    Defendant moved for reconsideration, arguing that the court should not impose such a *de facto* life sentence without making an explicit finding that he was permanently incorrigible and beyond rehabilitation and that both our mandate and the Illinois Supreme Court's holding in *Holman* required such a finding. The trial court rejected that argument and denied the motion.

Relying on *Jones*, the trial court stated that it did not believe that it was required to make such a finding and declined to do so. Defendant timely appealed.

¶ 33                                II. ANALYSIS

¶ 34    Defendant raises several arguments on appeal, including whether the trial court violated the federal and state constitutions by imposing a *de facto* life sentence without first finding that defendant was permanently incorrigible. Our supreme court in *Wilson*, 2023 IL 127666, ¶ 42, however, held that a sentencing court is not constitutionally required to find a juvenile defendant permanently incorrigible before imposing a *de facto* life sentence. We therefore consider the nonconstitutional arguments raised by defendant.

¶ 35        A. The Trial Court's Application of Relevant Statutory Sentencing Factors

¶ 36    "It is well settled that the trial court has broad discretionary powers in imposing a sentence [citation], and the trial court's sentencing decision is entitled to great deference [citation]." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). However, "[a]lthough the trial court is vested with wide discretion in sentencing, such discretion is not without limitation." *Id.* The weight to be attributed to each factor in aggravation and mitigation depends upon the particular circumstances of the case. *Id.* A trial court need not expressly state that it has considered each of the mitigating factors. *People v. Ayala*, 386 Ill. App. 3d 912, 920 (2008). There is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998).

¶ 37    Thus, we review deferentially the trial court's assessment of the proper weight to be given to each of the statutory mitigating and aggravating factors. However, the question of whether the trial court relied upon improper sentencing factors is reviewed *de novo*. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. Similarly, when the question is whether the trial court interpreted the

statutory factors correctly, our review is *de novo*. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 26. "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Larson*, 2022 IL App (3d) 190482, ¶ 29. "A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *People v. Heider*, 231 Ill. 2d 1, 21 (2008).

¶ 38     Defendant contends that the trial court erred in its application of the statutory sentencing factors, both the youth-related mitigating factors in section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West 2018)) and the general aggravating factors set out in section 5-5-3.2 (*id.* § 5-5-3.2). He argues that these errors arose in several ways.

¶ 39     In considering defendant's arguments, we rely on the familiar principles of statutory interpretation: our task is to give effect to the legislature's intent, and the best indicator of that intent is the plain language of the statute, which controls if that language is clear and unambiguous. *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003). "One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole," and thus "words and phrases must be interpreted in light of other relevant provisions of the statute." *J.S.A. v. M.H.*, 224 Ill. 2d 182, 197 (2007). "A court may also consider the reason for the statute, the problems it seeks to remedy, the purposes to be achieved, and the consequences of interpreting the statute one way or another." *Sperl v. Henry*, 2018 IL 123132, ¶ 23.

¶ 40     Defendant first argues that the trial court's consideration of the need to deter others from committing the same crime, a general aggravating factor (730 ILCS 5/5-5-3.2(a)(7) (West 2018)), was categorically improper when sentencing a juvenile offender. Defendant grounds this argument

in *Miller*, which stated that the need for deterrence cannot justify a life sentence for a juvenile offender because " ' "the same characteristics that render juveniles less culpable than adults" '—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." *Miller*, 567 U.S. at 472 (quoting *Graham v. Florida*, 560 U.S. 48, 72 (2010), quoting *Roper*, 543 U.S. at 571). We reject this argument.

¶ 41     By considering the need for deterrence, the trial court was doing no more than applying the law as enacted by the General Assembly. That body decided, after due consideration and debate, to implement the teachings of *Miller* by enacting section 5-4.5-105 of the Code, which lists potential mitigating factors to be considered *in addition to* the general statutory mitigating and aggravating factors when sentencing juvenile offenders. 730 ILCS 5/5-4.5-105(a) (West 2018) ("the court *** shall consider the following *additional* factors in mitigation in determining the appropriate sentence" (emphasis added)). Notably, when identifying the sentencing factors applicable to juvenile offenders, the legislature did not choose to place any limitations on courts' consideration of the general factors in aggravation, such as the need for deterrence—even if over-reliance on those factors might be contrary to the teachings of *Miller*. See *Miller*, 567 U.S. at 472 (noting that the need for deterrence is diminished when sentencing juveniles because their characteristics "make them less likely to consider punishment"); see also *People v. Smith*, 2022 IL App (4th) 200666, ¶¶ 28-30 (rejecting the argument that *Miller* forbids the consideration of deterrence as an aggravating factor in sentencing juvenile offenders); *People v. Diaz*, 2024 IL App (1st) 220033-U, ¶ 30 (though deterrence is diminished in juvenile sentencing, "it does not follow that deterrence may not be considered at all"). Because the legislature simply grafted the new, youth-related sentencing factors onto the existing sentencing scheme, the trial court did not err in considering the need for deterrence as an aggravating factor—it was simply following the plain directives of the sentencing statutes. See *Smith*, 2022 IL App (4th) 200666, ¶¶ 28-30.

¶ 42    In a similar vein, defendant argues that the trial court acted improperly when it considered his gang associations both as a slight mitigating factor under section 5-4.5-105(a)(2) (which asks whether the offender was "subjected to outside pressure, including peer pressure *** or negative influences" (*id.* § 5-4.5-105(a)(2)) and as a substantial aggravating factor under section 5-5-3.2(a)(15) (whether the offense was "related to the activities of an organized gang" (*id.* § 5-5-3.2(a)(15))). We agree that these two statutory provisions are challenging to harmonize and that, again, the legislature may not have fully thought through the practicalities in choosing to leave section 5-5-3.2's "gang-related" aggravating factor intact while adding the mitigating factor of peer pressure to commit the offense. Here again, however, the real problem lies with the interaction between the youth-related mitigating factors of section 5-4.5-105 and the general aggravating factors of section 5-5-3.2, not with the trial court, which simply applied both statutes as they direct. And although defendant argues that the trial court should not have weighed these competing mitigating and aggravating factors as it did, the weight to be given to various sentencing factors is a matter within the trial court's sound discretion, to which we must afford great deference. *Stacey*, 193 Ill. 2d at 209. Defendant has not overcome that deference here.

¶ 43    Defendant next argues that the trial court erred in considering the Adult Risk Assessment as a valid measure of his risk to reoffend, because the assessment is based on factors that are generally inapplicable to a juvenile. We agree. As was established during the cross-examination of Vanderlei, here that assessment was based on defendant's situation in 2009, at the time of the offense. But as a 16-year-old, defendant had no control over several of the key negative indicators in that assessment, such as the fact that he lived in a high-crime area, and his very youth itself prevented him from having other indicators of a low risk, such as the completion of high school and the securing of employment. Moreover, the assessment does not appear to take into account the greater rehabilitative potential of young offenders documented in studies and highlighted in

*Miller*, 567 U.S. at 471-72. The trial court's characterization of this assessment as "relevant and reliable" evidence was against the manifest weight of the evidence.

¶ 44    The trial court also erred in considering this assessment, along with other evidence it clearly viewed as negative, when considering applicable mitigating youth-related factors under section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2018)). That provision permits a sentencing court to consider, as an additional mitigating factor, "any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.* § 5-4.5-105(a)(9). The language and structure of section 5-4.5-105(a) make it clear that the purpose of subsection (a)(9) is to enable a sentencing court to consider other *mitigating* factors not specifically enumerated elsewhere in the statute. Further, as shown by the subsection's cautionary note about statements of remorse, if evidence is not mitigating, the court should not consider it under this subsection. The trial court erred in using this provision as an opportunity to consider nonmitigating evidence.

¶ 45    Defendant also argues that the trial court incorrectly interpreted the statutory factor of his ability to consider the risks and consequences of his behavior at the time of the offense. This evaluation is part of the first youth-related factor, which requires the sentencing court to consider "the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any." *Id.* § 5-4.5-105(a)(1). In discussing this factor, the trial court noted that defendant was 16 at the time of the offense and that, by at least one measure, his low average intelligence put his mental age about two years behind his peers of the same age. The trial court also found there was evidence that defendant had ADHD, was impetuous, and "would act impulsively, and suffer adverse consequences for such acts." However, it then immediately found

that, despite defendant's low average "range of functioning," there was nothing to indicate that defendant lacked the ability to consider the risks and consequences of his behavior. This latter finding was against the manifest weight of the evidence and shows a misinterpretation of the plain statutory language.

¶ 46    An impaired "ability to consider the risks and consequences of behavior" refers to the young brain's ability to accurately understand and assess the likely results of certain conduct, not simply intelligence or general ability to function. The trial court's own finding that defendant would act impulsively despite suffering adverse consequences from his actions demonstrates that he was *not* able to consider the risks and consequences of his behavior. The trial court erred by ignoring this evidence and misinterpreting the statutory language to reach a contrary conclusion.

¶ 47    Defendant next argues that the trial court improperly imposed a *de facto* life sentence despite recognizing defendant's rehabilitative efforts and potential. Defendant is essentially arguing that a juvenile offender should not be sentenced to lifelong imprisonment unless the offender is irredeemably corrupt or malevolent, so a court cannot impose such a sentence if it has found that the offender has some rehabilitative potential.

¶ 48    To the extent that defendant is raising a constitutional argument here, we must decline to address it if we can resolve the case on other grounds. See *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 38. Thus, here we consider *only* whether the trial court incorrectly applied the statutory mitigating factor of rehabilitative potential. Our legislature implemented *Miller*'s tenets by making "the person's potential for rehabilitation" one of the youth-related factors that a court sentencing a juvenile must consider.730 5/5-4.5-105(a)(4) (West 2018). Section 5-4.5-105 does not prevent a trial court from giving extra weight to the factor of rehabilitative potential or from finding that factor to be dispositive in appropriate cases. However, neither does it categorically bar a court from sentencing a juvenile to a *de facto* life sentence

despite finding that the juvenile has some rehabilitative potential. Rather, under the plain language of the statute, a juvenile's rehabilitative potential is one factor—albeit an important one—for the court to consider. See *id.* (including potential for or evidence of rehabilitation as one factor among several that courts must consider). We thus confine our analysis to holding that, under the current sentencing statutes (the constitutionality of which we do not address here), the trial court was not required to treat this factor as dispositive.

¶ 49    Lastly, defendant argues that the trial court relied on improper factors in sentencing him by impermissibly considering, as an aggravating factor, conduct that was inherent in his offenses of conviction. Section 5-5-3.2(a)(1) of the Code permits a court to consider, as an aggravating factor in sentencing, that a defendant's conduct "caused or threatened serious harm." *Id.* § 5-5-3.2(a)(1). However, it is improper for a court to rely on this factor when the causing of serious harm is inherent in the offense.

> "Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense. [Citation.] Stated differently, a single factor cannot be used both as an element of an offense and as a basis for imposing 'a harsher sentence than might otherwise have been imposed.' [Citation.] Such dual use of a single factor is often referred to as a 'double enhancement.' [Citation.] The prohibition against double enhancements is based on the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004).

¶ 50    Defendant was convicted of first degree murder and attempted murder, convictions that necessarily include as an element that he caused death and threatened the death of others. See 720 ILCS 5/9-1(a) (West 2008). Thus, it was improper for the trial court to have given "great weight"

to the aggravating factor that defendant's conduct caused or threatened serious harm. See *People v. Saldivar*, 113 Ill. 2d 256, 272 (1986). Similarly, the trial court stated that it placed "great weight" on the aggravating factor of deterrence because defendant engaged in gun violence, which "has no place in our society." However, the trial court also imposed a 25-year add-on (discretionary when sentencing juvenile offenders), for personally discharging a gun, to defendant's sentence. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018).

¶ 51    Where, as here, the record shows clearly that the trial court relied in part on an improper factor in fashioning a defendant's sentence, we must remand for resentencing unless we can determine that the court gave negligible weight to the improper factor. "A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *Heider*, 231 Ill. 2d at 21.

¶ 52    Here, the trial court explicitly stated that it placed "great weight" on the improper aggravating factor of whether defendant's conduct caused or threatened serious harm. Moreover, the trial court committed other legal errors in sentencing defendant, such as relying on the results of an Adult Risk Assessment that lacked validity under the circumstances here and finding that defendant was able as a 16-year-old to understand the risks and consequences of his behavior despite substantial evidence in the record demonstrating otherwise. Further, the trial court commented that it would have liked to impose a longer sentence but was prevented from doing so by statute, and in fact it improperly imposed a sentence for first degree murder that was five years more than defendant initially received (25 years instead of 20)[1] and that included the discretionary

---

[1]This longer sentence on defendant's first degree murder conviction violates section 5-5-4(a) of the Code, which provides that, in resentencing an offender after a successful appeal, a trial court may not

25-year add-on for the use of a firearm. All of this indicates that the trial court's errors may well have increased defendant's sentence. See *id.* at 24-25 (reliance on improper factor could not be deemed insignificant when the defendant received 4 years more than the minimum of a 6- to 30-year sentencing range). As we cannot rule out the possibility that the trial court's consideration of improper factors affected its judgment about the proper sentence, we must vacate that sentence. *Id.* at 21.

¶ 53 Our supreme court's decision in *Wilson* does not change our analysis. In *Wilson*, 2023 IL 127666, ¶ 40, the court overruled *Holman* and held that a sentencing court is not constitutionally required to find a defendant permanently incorrigible before imposing a *de facto* life sentence. Rather, under *Jones*, "a discretionary sentencing scheme that allows a court to consider youth and its attendant characteristics is 'constitutionally sufficient.' " *Id.* (quoting *Jones*, 593 U.S. at 105). Because *Wilson* was limited to this constitutional question, its holding has no bearing on our determination that the trial court erred in its consideration of improper sentencing factors under the Code. As the trial court's sentencing errors require us to vacate defendant's sentence, we do not address his remaining arguments.

---

impose a sentence that is "more severe than the prior sentence." 730 ILCS 5/5-5-4(a) (West 2018). Defendant's original sentence for first degree murder totaled 45 years (20 years for the offense itself, plus a 25-year add-on for using a gun). This sentence was improperly increased in the second sentence defendant received, but we vacated that sentence in its entirety. Thus, in a subsequent resentencing, the trial court could not impose any sentence longer than the 45 years that defendant initially received for first degree murder unless it found an increase appropriate based on defendant's conduct after his original sentencing. *Id.* The trial court here made no such finding.

¶ 54          B. Reassignment on Remand; Failure to Comply with Mandate

¶ 55    Defendant asks that we remand to a different judge for resentencing. Our supreme court recently addressed when an appellate court may order the reassignment of a judge on remand. In *Class*, the supreme court considered whether, "in a postconviction proceeding, an appellate court can, *sua sponte*, order reassignment to a new circuit court judge on remand for reasons other than bias, potential bias, or prejudice on the part of the prior circuit court judge." *Class*, 2025 IL 129695, ¶ 1. The court determined that, although Illinois Supreme Court Rule 615(b)(2) (eff. Jan. 1, 1967) gives the appellate court "the authority to modify the subsequent proceedings by directing that a new judge be assigned on remand," an appellate court may only *sua sponte* order reassignment when there is record evidence of bias, potential bias, or prejudice by the trial court. (Internal quotation marks omitted.) *Class*, 2025 IL 129695, ¶¶ 31, 35-37. The court reasoned that, under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)), a criminal defendant is "not entitled to the full panoply of constitutional rights that accompany an initial criminal prosecution" and there is no absolute right to the substitution of a judge in postconviction proceedings. *Class*, 2025 IL 129695, ¶¶ 32-33. The due process considerations under these circumstances are whether the proceedings had "the absence of actual bias" and "the absence of the probability of bias." (Internal quotation marks omitted.) *Id.* ¶ 34. Additionally, the court cautioned the appellate court against raising such issues *sua sponte* because it could " 'have the effect of transforming the court's role from that of jurist to advocate.' " *Id.* ¶ 35 (quoting *People v. Givens*, 237 Ill. 2d 311, 328 (2010)). The supreme court also distinguished cases in which it *sua sponte* ordered reassignment on remand where there was no evidence of bias or partiality, noting that the supreme court possesses, under the Illinois Constitution, "broad supervisory authority that the appellate court does not possess." *Id.* ¶ 40. Finally, the supreme court stated that, because those cases were distinguishable, it would not address whether those cases support the proposition that "factors

other than bias may support reassignment upon remand to the trial court in direct appeals." *Id.* ¶ 41 n.2.

¶ 56     Here, *Class* is distinguishable for two reasons. First, *Class* involved proceedings under the Post-Conviction Hearing Act, while this is a direct appeal of defendant's sentence. Second, *Class* involved the *sua sponte* reassignment of the trial judge on remand, while defendant explicitly asked for reassignment here. While the majority did not address bases for reassignment in direct appeals, Justice Cunningham's partial concurrence and partial dissent in *Class* addressed some concerns similar to the circumstances presented here. Justice Cunningham recognized that "[t]he most important situation that can prompt judicial reassignment by the appellate court *** is when the circuit court has failed to obey the appellate court's mandate." *Id.* ¶ 75 (Cunningham, J., concurring in part and dissenting in part, joined by O'Brien, J.). Otherwise, the trial judge may refuse to follow the mandate without fear of reassignment. *Id.* Neither the State nor the majority disagreed with this proposition, and indeed, the State "fully recognize[d] that, when the appellate court orders judicial reassignment to ensure compliance with its mandate, it is, in fact, applying basic principles of due process." *Id.* ¶¶ 77-78. Thus, a trial court's failure to adhere to the appellate court's mandate shows the trial court's bias toward a particular outcome, and the appellate court must be able to enforce its mandate through reassignment. *Id.*

¶ 57     The trial court here brazenly disregarded our mandate. It is well established in precedent stretching back more than a century that "a trial court must obey the clear and unambiguous directions in a mandate issued by a reviewing court." *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276 (1982) (collecting cases). "[W]hen a reviewing court issues a mandate, it vests the trial court with jurisdiction to take only such action as conforms to that mandate." *Id.* Even where the reviewing court's directions are erroneous, the trial court is nonetheless required to strictly follow those directions. *Id.* at 277; see also *Chicago Ry. Equipment Co. v. National Hollow Brake Beam*

*Co.*, 239 Ill. 111, 115 (1909) (although a reviewing court "may err in its directions to an inferior court, *** however erroneous the directions given may be, it is the duty of the inferior court to strictly follow the directions contained in the mandate" of the reviewing court). "Any other order issued by the trial court is outside the scope of its authority ***." *Schreier*, 92 Ill. 2d at 276-77.

¶ 58 Our mandate contained an unambiguous direction to make required findings when resentencing defendant under then-binding case law. *Reyes*, 2020 IL App (2d) 180237, ¶ 32. Instead, the trial court, of its own accord, decided that *Jones* conflicted with our mandate and followed *Jones.* When the appellate court issues a mandate remanding the case to the trial court for resentencing, even if the mandate is erroneous, the trial court has "no discretion to do anything other than sentence defendant in conformity with the *** mandate." *People v. Murray*, 2023 IL App (4th) 220330, ¶ 12. "[O]nce the reviewing court has rendered its decision and issued its mandate, it must be obeyed." *People v. Brown*, 2022 IL 127201, ¶ 28. A trial court "may not look elsewhere for authority to change the mandate's meaning or direction." *Id.* ¶ 21. An erroneous mandate can be corrected "only in the appellate court whose judgment it is." (Internal quotation marks omitted.) *Id.* ¶ 25. The trial court thus had no authority to depart from the clear terms of our mandate. Whether our mandate was erroneous and required a different outcome under *Jones* was for this court or our supreme court to determine. Accordingly, we remand for resentencing before a new trial judge.

¶ 59                                      III. CONCLUSION

¶ 60 For the foregoing reasons, we vacate defendant's sentence and remand for resentencing consistent with this opinion. The cause is remanded to the presiding judge of the criminal division to assign a new judge for resentencing.

¶ 61 Vacated and remanded.

¶ 62 JUSTICE BIRKETT, concurring in part and dissenting in part:

¶ 63    I agree with the majority that defendant is entitled to a new sentencing hearing because the trial court placed "great weight" on a factor inherent in the offenses, that Reyes's conduct "caused or threatened serious harm." *Supra* ¶ 50; see *People v. Salvidar*, 113 Ill. 2d 256, 272 (1986) ("the record demonstrates that the circuit court focused primarily on the end result of the defendant's conduct, *i.e.*, the death of the victim").

¶ 64    As the majority points out (*supra* ¶ 3), our supreme court issued a supervisory order directing this court as follows:

> "In the exercise of this Court's supervisory authority, the Appellate Court, Second District, is directed to vacate its judgment in *People v. Reyes*, case No. 2-21-0423 (03/22/23). The appellate court is directed to consider the effect of this Court's opinion in *People v. Wilson*, 2023 IL 127666, on the issue of whether the trial court erred by imposing a *de facto* life sentence without making an explicit finding that defendant was permanently incorrigible and beyond rehabilitation, and determine if a different result is warranted. If the appellate court remands the case for resentencing before a different judge, the appellate court shall explain the basis and rationale for its decision to order reassignment to a different judge on remand." *People v. Reyes*, No. 129592 (Ill. Sept. 27, 2023) (supervisory order).

¶ 65    As our supreme court explained in *Wilson*, " 'when the Supreme Court adopts a particular framework for applying a federal constitutional provision, we are required to follow that framework, regardless of how other courts, including this one, may have approached the issue in other decisions.' " *Wilson*, 2023 IL 127666, ¶ 42 (quoting *People v. Hood*, 2016 IL 118581, ¶ 22). Setting aside the trial court's failure to comply with our mandate in this case, the trial court did not err in imposing a *de facto* life sentence without making an explicit finding that defendant was permanently incorrigible and beyond rehabilitation because such findings are not required so long

as a discretionary sentencing scheme allows a court to consider youth and its attendant characteristics. *Id.* (quoting *Jones v. Mississippi*, 593 U.S. 98, 115 (2021)). The trial court explained that it believed the sentence imposed was "inconsistent with the law that existed on the date [it] sentenced him." However, a different outcome is not required because the trial court made a serious sentencing error by placing "great weight" on a factor inherent in the offenses.

¶ 66    The supreme court directed us to explain "the basis and rationale for [our] decision to order reassignment to a different judge on remand." *Reyes*, No. 129592 (supervisory order). The majority concluded that "[t]he trial court *brazenly* disregarded our mandate." (Emphasis added.) *Supra* ¶ 57. I disagree. During the sentencing hearing, both parties presented arguments in response to the trial court's question whether "*Jones* [*v.*] *Mississippi*, which was issued last week, does that have an impact on this case?" The trial court explained in detail why it believed the United States Supreme Court's decision in *Jones v. Mississippi* should guide its determination. During its ruling on defendant's motion to reconsider his sentence, the trial court stated in part:

> "I think that having considered all of these things, I still believe and will find that I believe that *Jones* [*v.*] *Mississippi* decision released by the U.S. Supreme Court on their opinion issued on April 22nd of this year still provides substantial guidance, particularly when considering it in the light of other U.S. Supreme Court cases, *Roper* [*v.*] *Simmons*, 543 U.S. 551 from 2005. *Miller* [*v.*] *Alabama*, 567 U.S. 460, 2012. *Montgomery* [*v.*] *Louisiana*, 577 U.S. 190, a 2016 case.
>
> So I think there's a progeny of cases heard and rulings made by the U.S. Supreme Court, and *Jones* [*v.*] *Mississippi* just being the latest in a long line of cases going back to 2005.
>
> To say that I should focus only on *Miller* [*v.*] *Alabama* and ignore the other U.S. Supreme Court cases I'm not sure is entirely correct. I don't believe the courts in Illinois

have the option of considering some of the decisions of the U.S. Supreme Court and ignoring others. Just as they don't have the option to consider some cases by the Illinois Supreme Court or Illinois Appellate Court for the Second District and ignoring others.

I think the case law in its entirety as it is and that while certainly the Appellate Court in the prior most recent appeal did make certain findings, this was also before *Jones* [*v.*] *Mississippi* which I believe this Court has fully complied with all those requirements.

There is no mandatory nature to these, it is solely discretionary and the Court did consider all the relevant factors at the time of imposing sentence at the sentencing hearing."

¶ 67 I note that, while defense counsel did refer the trial court to this court's mandate, neither counsel cited cases that stood for the proposition that a trial court must follow the reviewing court's mandate even if it is erroneous.

¶ 68 The majority cites *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276 (1982), for the proposition that a trial court must obey "clear and unambiguous" directions in a mandate from a reviewing court. In *Schreier*, the trial court found the defendants guilty of Class X offenses but sentenced them "as Class 3 felons." The supreme court issued a supervisory order and remanded the case "to the circuit court with directions to resentence defendants in accordance with the law." (Emphasis and internal quotation marks omitted.) *Id.* at 274. On remand, the defendants filed a new motion for a new trial, which was granted, and the case was transferred to another judge. The State sought leave to file a petition for *mandamus*. The supreme court issued the writ of *mandamus* "directing the *respondent* to comply with our prior mandate and to resentence defendants as Class X felons." (Emphasis added.) *Id.* at 279.

¶ 69 While I agree with the majority that the trial court was bound by our mandate, I disagree that assignment of a new judge is warranted. As our supreme court explained in *People v. Class*, 2025 IL 129695, ¶ 51, "judicial rulings almost never constitute a valid basis for a claim of judicial

partiality or bias." "To hold otherwise would arguably require reassignment any time the appellate court reversed and remanded a circuit court's order for failing to follow applicable law." *Id.* As in *Class*, there is nothing in the record to suggest that, on remand, the trial court will refuse to follow our mandate, especially in the unique circumstances presented to the trial court.

¶ 70 The majority cites Justice Cunningham's partial concurrence and partial dissent in *Class* for the proposition that "[t]he most important situation that can prompt judicial reassignment by the appellate court *** is when the circuit court has failed to obey the appellate court's mandate." *Class*, 2025 IL 129695, ¶ 75 (Cunningham, J., concurring in part and dissenting in part, joined by O'Brien, J.). Justice Cunningham went on to explain that these "times" are rare.

> "Though rare, there are times when a circuit court refuses to follow the appellate court's directions after a case has been remanded, not because of personal feelings of favoritism or antagonism toward one of the parties or because of a conflict of interest, but because of a disagreement with the appellate court over governing principles of law." *Id.*

Justice Cunningham cited *People v. Sanchez-Segura*, 2024 IL App (3d) 240082-U, and *People v. Gurga*, 176 Ill. App. 3d 82 (1988). In those cases, the term "brazen" would aptly apply to the trial court's failures to follow the appellate court mandates.

¶ 71 In *Sanchez-Segura*, the case was back before the trial court following an appeal from a pretrial detention order for the second time. The trial court had been directed by the Third District to make the required findings and on remand said:

> " 'This is what the Appellate Court wants. They want me to make these findings. And quite frankly, be careful what you ask for. They can sit in Ottawa and order me to make findings and they want me to follow the bail law, so by clear and convincing evidence I may find two out of the three.' " *Sanchez-Segura*, 2024 IL App (3d) 240082-U, ¶ 5.

The trial court went on to criticize members of the "third branch of our government" for "rubber stamping" social justice reform. (Internal quotation marks omitted.) *Id.* ¶ 7. The appellate court again reversed the trial court's detention order and remanded for a new hearing on the State's petition to detain, stating, "On remand, the new detention hearing *should* be held in front of a different judge." (Emphasis added.) *Id.* ¶ 11. Presiding Justice McDade filed a special concurrence commenting that the case should not be reassigned. *Id.* ¶ 17 (McDade, P.J., specially concurring).

¶ 72    In *Gurga*, the defendant was found guilty after a bench trial of murder, attempted murder, and home invasion. On appeal, the appellate court held that the trial court's guilty judgment was against the manifest weight of the evidence and remanded the case for entry of a judgment of "guilty but mentally ill" and for resentencing based on that judgment. *Gurga*, 176 Ill. App. 3d at 83. On remand, the trial court imposed the identical sentence it originally imposed (40 years for murder, 30 years for attempted murder, and 20 years for home invasion) despite no new evidence from the State and mitigating evidence of the defendant's good behavior in prison and witnesses who "testified regarding his good character." *Id.* The trial court made the following remarks:

> " 'The case has been remanded in the wisdom of this panel of Appellate Court judges, the wisdom of which the Court, this Court, is in complete and total disagreement with, but nonetheless in that this is the structure of the Court system, decadent as it is, the Court here and now enters a judgment consistent with this Appellate Court remand, and the judgment now entered is one of guilty but mentally ill.' ***
>
> > '[A] judge has to think in two ways, what is rational, probable, logical, and then you have to think, what will the Appellate Court's view be? So, that appears to be what the situation was here. What they have done here again is substitute their judgment for [ours], and as we have often observed *** we are headed into the 21st Century, but we have a 19th Century system of appeals.' " *Id.* at 83-84.

The appellate court held that the record showed that the trial court "refused to give serious consideration to the factor relating to the 'guilty but mentally ill' provision to the pertinent statute." *Id.* at 84. The record in this case does not establish that the trial court "brazenly" refused to follow our mandate.

¶ 73 It is readily apparent to me that the trial court believed that, because the United States Supreme Court made clear in *Jones* that the eighth amendment does not require a finding that defendant was beyond rehabilitation, it was not required to follow our mandate. See *In re N.G.*, 2018 IL 121939, ¶ 41; *People v. Wilson*, 2023 IL 127666, ¶ 42.

¶ 74 Defendant fails to cite any authority for the proposition that errors alone, including the failure to follow an appellate court mandate, justify assignment of a new judge. In his supplemental brief, defendant cites *People v. Campbell*, 2023 IL App (1st) 220373, ¶ 69, for the proposition that "factors other than bias may, in rare cases, require reassignment at the trial [court] level." In *Campbell*, as in this case, our supreme court entered an order remanding the case to the appellate court to explain the "basis and rationale for [the] decision to order reassignment in [the] case." *Id.* ¶ 66. On remand, the First District applied factors the "federal appellate courts apply when they exercise their reassignment powers under section 2106 of the United States Code (28 U.S.C. § 2106 (2018))." *Id.* ¶ 71.

¶ 75 The First District cited a Ninth Circuit case, *Manley v. Rowley*, 847 F.3d 705, 712 (9th Cir. 2017), which set out the factors:

> "We will reassign a case to a new judge on remand only under 'unusual circumstances' or when required to preserve the interests of justice.' [Citation.] We need not find actual bias on the part of the district court prior to reassignment. [Citation.] Rather, we consider:
>
> > (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed

views or findings determined to be erroneous or based on evidence that must be rejected,

(2) whether reassignment is advisable to preserve the appearance of justice, and

(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving [the] appearance of fairness. [Citations.]"

*Manley*, 847 F.3d at 712.

In applying these factors, the First District found that "the confidence we generally have that, on remand, a judge will be able to set aside any previously expressed views or findings is absent." *Campbell*, 2023 IL App (1st) 220373, ¶ 73. The appellate court noted that the trial court had "indicated that [it] had not even listened to [the defendant's] lengthy statement in allocution— which [the defendant] began by saying 'I truly am sorry ***.' " *Id.* ¶ 74. The appellate court also noted that "that [was] not the first time this judge has indicated an aversion to applying the more lenient juvenile sentencing rules our society has come to accept as morally and constitutionally required." *Id.* ¶ 75 (citing *People v. McKinley*, 2020 IL App (1st) 191907, ¶¶ 80, 90). In this case, there is nothing in the record to suggest that the trial court has an aversion to applying the youth sentencing factors.

¶ 76    In *Campbell*, the appellate court stated that

"even if our supreme court concludes that judicial bias, analogous to the showing needed for a for-cause substitution, is the only basis on which we may order reassignment to a new judge on remand, reassignment here would still be supported by the record for all the reasons set forth above." *Id.* ¶ 78.

¶ 77     In *Class*, 2025 IL 129695, ¶ 19 (majority opinion), as in this case, our supreme court "entered an order remanding the case to the appellate court for the limited purpose of explaining

the basis and rationale for the appellate court's decision to order reassignment." The appellate court filed a modified opinion. *People v. Class*, 2023 IL App (1st) 200903. In its modified opinion, the appellate court applied the three factors set out in *Manley. Id.* ¶¶ 90-94. The appellate court also addressed the State's argument that it erred in ordering reassignment *sua sponte*. In rejecting the State's argument, the appellate court noted that federal courts "routinely exercise that power in criminal cases both upon request and '*sua sponte* by the court on the defendant's behalf.' " *Id.* ¶ 97 (quoting *United States v. Awadallah*, 436 F.3d 125, 135 (2d Cir. 2006) (Second Circuit denied "the Government's motion to remand this case to a different judge.")).

¶ 78     Following the filing of the appellate court's modified opinion in *Class*, our supreme court allowed the State's petition for leave to appeal. 2025 IL 129695, ¶ 24. Our supreme court noted that it had "not addressed whether Rule 615(b) authorizes an appellate court to order reassignment to a new judge upon remand." *Id.* ¶ 28. Our supreme court recognized that the appellate court in *Class*, as well as in other cases, had cited both Rule 366(a)(5) (Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994)) and Rule 615(b) in finding it had discretion to order reassignment. *Id.* Our supreme court held that Rule 366(a) does not apply to criminal cases. *Id.* ¶ 29. "Accordingly," the court "looked to Rule 615(b) to determine whether the appellate court had the authority to order reassignment to a new judge on remand." *Id.* ¶ 31. Our supreme court held that Rule 615(b)(2), which provides that the reviewing court may "modify any or all of the proceedings subsequent to *** the judgment or order from which the appeal is taken" (Ill. S. Ct. R. 615(b)(2) (eff. Jan. 1, 1967)), includes the authority to direct that a new judge be assigned on remand. *Class*, 2025 IL 129695, ¶ 31. Our supreme court then stated that "[t]he question then is under what circumstances may an appellate court *sua sponte* order that a new judge be assigned upon remand of the case." *Id.* ¶ 32. The court noted that its "analysis of this issue is informed and limited by the posture of this case," which

involved a successive postconviction petition where the petitioner was "not entitled to the full panoply of constitutional rights that accompany an initial criminal prosecution." *Id.* ¶¶ 32-33.

¶ 79    As the majority points out, *Class* is distinguishable from this case because it involved a postconviction proceeding and the appellate court ordered reassignment *sua sponte*. This case is still on direct review, and defendant has requested reassignment. Neither of these distinctions, however, should alter our analysis.

¶ 80    A trial judge is "presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *Eyechaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Erroneous rulings or findings are insufficient reasons to believe a court has a personal bias for or against a party. *Id.* (citing *In re Marriage of Hartian*, 221 Ill. App. 3d 566, 569 (1991)). "[I]t is assumed that trial judges will be able to set aside any biases or predispositions they might have." *People v. Conway*, 2023 IL 127670, ¶ 22. Our supreme court has repeatedly established "that only the most extreme circumstances warrant disqualifying a trial judge due to judicial bias." *Id.* (citing *People v. Jackson*, 205 Ill. 2d 247, 276 (2001)).

¶ 81    While we have the authority under Rule 615(b) to order assignment of a new judge on remand, this case does not present "extreme circumstances" that justify assignment of a new judge. The majority's displeasure with the trial court's decision to follow *Jones* instead of our mandate, in and of itself, is not a recognized ground to order assignment of a new judge.[2] Assignment of a new judge is not a matter to be taken lightly. *People v. Vance*, 76 Ill. 2d 171, 179 (1979). "It will

_____

[2]See *People v. Gregory*, 2024 IL App (4th) 240522-U, ¶ 42 ("By accepting the State's argument [to follow *Jones*] and reimposing defendant's sentence without holding a sentencing hearing, the trial court failed to obey the mandate of the appellate court."). The *Gregory* case was remanded for resentencing. *Id.* ¶ 44.

be viewed by some as reflecting unfavorably upon the judge, and it tends to disrupt the orderly functioning of the judicial system." *Id.* I respectfully dissent from that portion of the majority's opinion requiring the assignment of a new judge on remand.

---

*People v. Reyes*, **2025 IL App (2d) 210423-B**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 09-CF-505; the Hon. Robert P. Pilmer, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Christopher L. Gehrke, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eric C. Weis, State's Attorney, of Yorkville (Patrick Delfino, Edward R. Psenicka, and David S. Friedland, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---