NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250083-U

NOS. 4-25-0083, 4-25-0084 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 24, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Stephenson County |
| MARCQUETTE J. VERNER, | ) | Nos. 22CF304 |
| Defendant-Appellant. | ) | 23CF63 |
| | ) | |
| | ) | Honorable |
| | ) | Glenn R. Schorsch, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed defendant's convictions and sentences but ordered the correction of the mittimus to reflect defendant's three-year term of mandatory supervised release, concluding that (1) the trial court did not abuse its discretion by extending the speedy-trial term to complete DNA testing; (2) the court did not err in finding defendant fit to stand trial following a retrospective fitness hearing; (3) defendant's 12-year sentence was neither excessive nor the product of an improper double enhancement; and (4) the armed habitual criminal statute does not violate the second amendment (U.S. Const., amend. II).

¶ 2        In October 2022, the State charged defendant, Marcquette J. Verner, with two counts of unlawful use of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2022)) and one count of being an armed habitual criminal (AHC) (Stephenson County case No. 22-CF-304) (*id.* § 24-1.7(a)(2)). In March 2023, the State charged defendant with aggravated battery of a correctional officer arising out of an incident that occurred in the Stephenson County jail (Stephenson County case No. 23-CF-63) (*id.* § 12-3.05(d)(4)).

¶ 3        In June 2023, a jury found defendant guilty of AHC and UUWF. In a bench trial that same month, the trial court found defendant guilty of aggravated battery. The court later sentenced defendant to concurrent sentences of 12 years for AHC and 5 years for aggravated battery.

¶ 4        Defendant appealed, arguing the trial court erred by relying on stipulations to the expert's fitness report to find he was fit to stand trial. This court agreed, reversed the trial court's April 19, 2023, finding that defendant was fit to stand trial and be sentenced, and remanded for a retrospective fitness hearing. *People v. Verner*, No.4-23-0923 (2024) (unpublished summary order under Illinois Supreme Court Rule 23(c)). On remand, the trial court again found defendant had been fit to stand trial and be sentenced.

¶ 5        Defendant appeals, arguing that (1) the trial court abused its discretion by granting the State a 120-day extension of the speedy-trial term to complete DNA testing; (2) the court erred by finding him fit at the retrospective fitness hearing; (3) his 12-year sentence was excessive and the product of an improper double enhancement; and (4) the AHC statute violates the second amendment to the United States Constitution (U.S. Const., amend. II). We disagree, affirm as modified, and remand with directions.

¶ 6                              I. BACKGROUND

¶ 7                              A. The Charges

¶ 8        In October 2022, in case No. 22-CF-304, the State charged defendant with one count of AHC, a Class X felony, alleging he possessed a firearm after having been convicted twice of aggravated unlawful use of a weapon (*id.* § 24-1.7(a)(2), (b)). The State also charged him with two counts of UUWF, a Class 2 felony (*id.* § 24-1.1(a), (e)).

¶ 9        In March 2023, in case No. 23-CF-63, the State charged defendant with aggravated

battery of a correctional officer, a Class 2 felony (*id.* § 12-3.05(d)(4), (h)). This charge alleged that defendant struck a correctional officer while attempting to escape from a secure area of the Stephenson County jail.

¶ 10                                      B. Pretrial Proceedings

¶ 11        On the evening of October 9, 2022, law enforcement officers arrested defendant. On October 13, 2022, defendant demanded a speedy trial.

¶ 12        On January 12, 2023, the State moved orally for a continuance and an extension of the speedy-trial term pursuant to section 103-5(c) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5(c) (West 2022)) to complete DNA testing on the firearm police officers recovered from the scene of the shooting. The State explained its request for a continuance as follows:

> "Your Honor, the State can show that we've exercised due diligence in this matter. We will say that he was arrested on October 9th. The 96 days is correct that he's been in custody. There was a preliminary hearing date on October 13th for this case, at which time after the preliminary hearing date is when this case gets assigned to an attorney. But shortly after that, after reviewing the reports in this case, I requested touch DNA or fingerprint testing of the firearm.
>
> On November 16th of 2022, [Crime Scene Investigator] Stephen Olson did swab the firearm for DNA and submitted it to the lab that day. Yesterday, [January 11, 2023,] when I spoke with Forensic Scientist Heather May, she says that it takes three to four months for DNA testing—that was on the low end of that; and that after they received that, they do robotic testing, which takes 30 to 60 days, which is just finishing up now with that sample. And she did tell me that there was a— there is DNA on the firearm and specifically requested a sample from the defendant

for comparison. There could be—she did say that the sample that they have may potentially [be] put into [the Combined DNA Index System]. However, it would take longer to get that back. And then we're still in the same position of needing the sample of the defendant to analyze and have a witness at trial for that.

With this continuance that we're asking for, we're at 96 days now. The statute allows with DNA testing—725 ILCS 5/103-(5)(c) determines that if the State did exercise due diligence in the matter that the Court may continue an additional 120 days beyond the initial 120. In speaking with Ms. May, she said that once the defendant's DNA sample is at the lab, she needs approximately—she needs a minimum of 30 days to analyze that and then compare it to the DNA sample on the firearm.

So, we're looking for a continuance of 50 days. We would be well within a 120-day extension for the DNA testing. And, then, at that point in time, all the testing should be done and that we can go to trial in this matter. The DNA is a material piece of evidence in this case, as the firearm was not located directly on the person of the defendant but was located in an area a few feet away from him."

¶ 13          Defense counsel objected to the continuance, arguing that defendant had demanded a speedy trial since the time of the preliminary hearing, which occurred on October 13, 2022, and had been in custody since October 8, 2022. Defense counsel argued the State had not demonstrated due diligence in obtaining DNA testing of the firearm.

¶ 14          The trial court granted the extension, finding the State had exercised due diligence. The court also ordered defendant to submit to a buccal swab that same day. Defendant initially refused to comply with that order, which resulted in a contempt finding, but he eventually

submitted to the swab on January 24, 2023.

¶ 15                                  C. Defendant's Fitness To Stand Trial

¶ 16          In March 2023, defense counsel filed a motion to determine fitness, requesting that the trial court find a *bona fide* doubt of defendant's fitness to stand trial pursuant to section 104-11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104-11 (West 2022)). Counsel asserted that during his personal interactions with defendant, defendant displayed an inability to rationally engage in discussions regarding the facts of his case or potential defense strategies. After a hearing, the court found that a *bona fide* doubt existed regarding defendant's fitness and ordered a fitness evaluation.

¶ 17          On April 13, 2023, Dr. Betsy Lohr filed a fitness report. Lohr indicated that her report was based on her meeting with defendant and discussions with the Stephenson County jail's mental health staff. The report did not indicate that Lohr attempted to obtain or review any of defendant's previous medical or mental health records.

¶ 18          According to the report, defendant understood the charges and court procedures and was capable of communicating. Defendant described hearing voices of people wanting to hurt him after documents pertaining to a March 2015 murder case were released. Regarding the voices, Lohr wrote, "[Defendant] appears to live in a dangerous community and it is suspected that his concerns for his safety are based in reality and that he is always on guard." She noted that defendant stated the voices did not interfere with his ability to comprehend the meeting or other conversations. Defendant was not known to the mental health staff at the jail, and he denied receiving prior mental health treatment. Although defendant expressed concerns about his food, Lohr concluded that his thoughts did "not appear to reach the level of paranoid." Finally, although Lohr acknowledged that defendant struck a correctional officer, she found his actions were "more likely related to

- 5 -

behavioral issues as opposed to mental health issues." Lohr concluded that defendant was fit to stand trial.

¶ 19　　　　In April 2023, the trial court conducted a fitness hearing. Defense counsel informed the court that the evaluation indicated defendant was fit to stand trial and defendant did not "appear to have any issues as far as the evaluator [wa]s concerned." Counsel requested the case be returned to the trial call. The State stipulated to the evaluation's findings. Based on the parties' agreement, the court found defendant fit to stand trial.

¶ 20　　　　In June 2023, the trial court conducted a final pretrial conference. The court noted defendant was wearing "protective clothing" and asked about his attire for trial. Defense counsel confirmed he would provide a shirt and pants. The court addressed defendant, stating, "[W]e don't want you with that smock on that you're wearing now, right? We want you to look *** presentable for the jury." The court further inquired, "Are you in a good mindset right now, do you understand what we're doing here, that we're going to be going to trial on Monday?" Defendant answered, "Yes." The court then explained the jury selection process, stating, "[W]e'll fill this courtroom with a bunch of different people, *** and once the jury is selected then we go forward with the trial." When asked if he understood, defendant again responded, "Yes."

¶ 21　　　　　　　　　　　D. The Trials

¶ 22　　　　　　　　1. *Case No. 22-CF-304 (The Weapons Charge)*

¶ 23　　　　In June 2023, the trial court conducted a jury trial on the weapons charges related to a shooting in Freeport, Illinois.

¶ 24　　　　Rachel Meyers testified she lived with her boyfriend, Dakota Pommerening, at the Hosmer Building. On the evening of October 9, 2022, around 8:38 p.m., Meyers and Pommerening were sitting on a bench in front of the building, smoking cigarettes. Meyers observed a man

standing near the front doors wearing a long coat, a half mask, and a baseball hat. She noted the man had his hand inside his pants in a manner suggesting he was holding a weapon. Meyers testified she had never seen the man before, but she identified him in court as defendant.

¶ 25        Pommerening remarked that something did not look right, so they extinguished their cigarettes and headed inside. As they approached the building, a red vehicle pulled into the circular driveway. Meyers testified defendant yelled an expletive at the vehicle, walked toward it, and then shots were fired. Meyers stated the vehicle contained three or four individuals who returned fire at defendant, blowing out the windows of the building. Defendant fled the scene, and Meyers called 911. Based on defendant's shouting, his movements, and the sounds of the gunfire, Meyers testified she believed defendant fired the first shots.

¶ 26        Pommerening testified that when he saw defendant that night, defendant appeared to be holding a gun. Pommerening explained defendant looked nervous, bounced back and forth, and constantly looked around. Pommerening observed defendant repeatedly reaching down his pants and noted the handle of a handgun was sticking out of defendant's waistband near his crotch area. Pommerening stated that when the SUV slowed down in front of the building, words were exchanged, and the parties began shooting back and forth. Pommerening testified he specifically saw defendant pull out a gun and shoot at the vehicle.

¶ 27        The State presented surveillance video from the apartment building. The video showed a man in a black coat and baseball hat walking near the entrance. As a red SUV pulled into the roundabout, the man ducked, held up his arm, and appeared to fire a gun as the SUV drove away.

¶ 28        Officer Alexis Simone testified that she responded to the scene and located defendant blocks away. She stopped him but released him after a pat-down revealed he did not

have any weapons. Shortly thereafter, Simone discovered a .40-caliber handgun with one chambered round and an attached magazine containing 18 rounds on top of a bush approximately 15 feet from where she had stopped defendant. Shortly thereafter, Simone arrested defendant.

¶ 29 Heather May, a forensic scientist, testified that she analyzed the swabs from the firearm that Simone recovered. She determined that although DNA was present, the sample was unsuitable for comparison to known standards, including defendant's.

¶ 30 The parties stipulated that defendant had two prior qualifying felony convictions. Ultimately, the jury found defendant guilty of AHC and both counts of UUWF.

¶ 31 2. *Case No. 23-CF-63 (The Jail Incident)*

¶ 32 Following the jury trial, defendant waived his right to a jury for the aggravated battery charge, and in August 2023, the trial court conducted defendant's bench trial on the charge.

¶ 33 The evidence showed generally that on March 17, 2023, Officer Jacob Massetti was conducting a routine round of defendant's cell block and had a brief conversation with defendant regarding commissary. Massetti explained that as he prepared to exit, the main control operator remotely opened the door to defendant's cell block. When the door opened, defendant charged at Massetti. Massetti moved out of the way, and defendant exited the block into the main hallway without permission. Massetti pursued defendant down the hallway and radioed for assistance. Because the hallway ended in locked doors, Massetti maintained his distance in an attempt to deescalate the situation.

¶ 34 Corporal Shannon Lameyer entered the opposite end of the hallway to assist Massetti and ordered defendant to place his hands on the wall. Although defendant initially appeared to comply, he became hostile and backed away. Lameyer deployed her Taser, but it had no effect on defendant. Defendant then lunged toward her and punched her in the left cheek with

his fist, causing swelling, redness, and pain, which eventually developed into bruising under her left eye.

¶ 35　　　　Ultimately, the trial court found defendant guilty.

¶ 36　　　　　　　　　　E. The Sentencing Hearing

¶ 37　　　　In September 2023, the trial court conducted defendant's sentencing hearing. The State argued in aggravation that defendant's conduct threatened serious harm because he discharged a firearm at a moving vehicle occupied by multiple people. The State also emphasized defendant's prior weapons offenses and his battery of the correctional officer, noting that the officer suffered bruising.

¶ 38　　　　Regarding the shooting, defense counsel argued that the occupants of the vehicle "acted first," providing some justification for defendant's actions. Counsel further noted that although defendant was fit to stand trial, he suffered from mental health issues.

¶ 39　　　　Following the parties' arguments, the trial court issued its oral ruling. In reaching its decision, the court stated it had considered the trial evidence, presentence investigation report (PSI), and defendant's history, character, and attitude. The court also considered the evidence and arguments, defendant's statement in allocution, the statutory factors in aggravation and mitigation, and the circumstances of the offenses. The PSI indicated that defendant had (1) two prior convictions for aggravated unlawful use of a weapon, (2) a misdemeanor conviction for criminal trespass, and (3) convictions for various traffic offenses. The report also noted defendant's tumultuous upbringing, which included significant periods of homelessness.

¶ 40　　　　The trial court stated its ruling and reasoning as follows:

"I find most importantly in aggravation that both of these events caused or threatened serious harm to individuals in that a firearm was discharged in the

direction of other people and it may or may not have been in response to [defendant] himself being shot at, but nonetheless a firearm was discharged in the direction of individuals and that caused or threatened serious harm and I think the activities at the Stephenson County Jail where there was an escape attempt obvious on the video that the jury saw, and in the course of trying to detain [defendant], one of the correctional officers, a female, was punched square in the face.

So, there was some threatened harm and serious harm in this matter, and the Court also considered the history of prior criminal acts and also the deterrence of others.

In mitigation, [defense counsel] is correct in that there is just something off a little bit about [defendant]. I think [defendant] understands what's going on around him, but I think [defendant] is a little bit detached. There were some matters regarding fitness in this case and there were evaluations and it was concluded this [defendant] was fit to stand trial, but the Court does consider that some of his actions may be because his thought process is just not normal.

Nonetheless, the Court does find that a sentence of probation or conditional discharge is not—the Class X is not available, and the second case I believe it would depreciate [*sic*] the seriousness of the crime committed and would be inconsistent with the ends of justice. Also having due consideration for the fact that the cost of confinement is approximately $30,000 per year.

The State makes an excellent argument as to consecutive sentences in this case, and the defense makes an excellent counter argument as to consecutive sentences in this case. I will not be imposing consecutive sentences in this case."

¶ 41          Ultimately, the trial court sentenced defendant to concurrent terms of (1) 12 years in prison for AHC (case No. 22-CF-304), to be served at 85%, and (2) 5 years in prison for aggravated battery (case No. 23-CF-63), to be served at 50%.

¶ 42          Defendant appealed, arguing the trial court erred by relying on stipulations to the expert's fitness report to find defendant fit to stand trial. This court agreed, reversed the April 19, 2023, fitness determination and remanded for a retrospective fitness hearing. *Verner*, No. 4-23-0923 (2014) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 43                          F. The Retrospective Fitness Hearing

¶ 44          In January 2025, following remand from this court, the trial court conducted the retrospective fitness hearing. Lohr testified regarding her April 2023 evaluation of defendant. She stated that defendant understood the charges, court procedures, and role of court personnel. Regarding defendant's mental health, Lohr testified that defendant reported hearing voices since 2015 telling him that people wanted to hurt him. Lohr believed these fears "probably were based in reality," given his concerns for his safety in the community. Although defendant reported hearing the voices frequently, including during the interview, he stated they did not disrupt his thought process. Lohr observed that defendant did not appear to be responding to internal stimuli and was able to concentrate and answer questions.

¶ 45          Lohr also conducted a mental status screening to assess defendant's cognitive functioning. Defendant answered 27 of 28 items correctly. He was oriented to time and place, knowing the date and that he was in the Stephenson County jail, although he did not know the specific town. Lohr found defendant's short-term memory was intact and he was capable of "mental manipulation"—meaning he could process and utilize information effectively. Regarding defendant's complaints about jail food, Lohr determined they stemmed from simple dislike rather

than paranoid delusions of poisoning. Lohr reiterated her opinion from her April 2023 report that defendant's issues were behavioral rather than mental. She concluded that no new information had arisen to change her opinion and that defendant was fit at the time of trial.

¶ 46 Neither party offered additional testimony or evidence.

¶ 47 The trial court considered Lohr's testimony and the original report. When ruling, the court initially stated that the prior proceedings involved a plea agreement. Defense counsel corrected the court, noting it was a jury trial. The court accepted the correction and acknowledged that the parties had previously "erroneously stipulated" that defendant was fit. The court noted that the proper procedure would have been to stipulate that the expert would testify consistently with her report.

¶ 48 However, the trial court found that the evidence presented at the retrospective hearing established defendant's fitness. The court highlighted Lohr's testimony that defendant was "properly oriented" as to date, place, and time. Additionally, the court noted that defendant was able to process information, understood the nature of the charges against him, and understood the roles of the parties. Based on the expert testimony and the original report, the court stated it had made an independent finding that defendant was fit at the time of both the trial and sentencing.

¶ 49 This appeal followed.

¶ 50 II. ANALYSIS

¶ 51 Defendant appeals, arguing that (1) the trial court abused its discretion by granting the State a 120-day extension of the speedy-trial term to complete DNA testing; (2) the court erred by finding him fit at the retrospective fitness hearing; (3) his 12-year sentence was excessive and the product of an improper double enhancement; and (4) the AHC statute violates the second amendment to the United States Constitution. We disagree, affirm as modified, and remand with

directions.

¶ 52                    A. Defendant's Speedy Trial Claim

¶ 53        Defendant first argues that the trial court abused its discretion by granting the State a 120-day extension of the speedy-trial term. He contends that the State failed to show due diligence because it waited over a month to swab the firearm and three months to request a DNA sample from him. Defendant acknowledges that he failed to preserve this issue in a posttrial motion. See *People v. Williams*, 2022 IL 126918, ¶ 48 ("To preserve a purported error for appellate review, a defendant must object to the error at trial and raise the error in a posttrial motion."). However, defendant contends that defense counsel's failure to preserve the issue constituted ineffective assistance.

¶ 54                    1. *The Applicable Law and the Standard of Review*

¶ 55        Every person in custody for an alleged offense shall be tried within 120 days from the date he was taken into custody. 725 ILCS 5/103-5(a) (West 2022). However, subsection (c) of the speedy-trial statute provides the following exception for DNA testing:

> "If the court determines that the State has exercised without success due diligence to obtain results of DNA testing that is material to the case and that there are reasonable grounds to believe that such results may be obtained at a later day, the court may continue the cause on application of the State for not more than an additional 120 days." *Id.* § 103-5(c).

¶ 56        We review a trial court's decision to grant an extension under section 103-5(c) for an abuse of discretion. *People v. Battles*, 311 Ill. App. 3d 991, 995 (2000).

¶ 57        Claims of ineffective assistance of counsel are reviewed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Keys*, 2025 IL 130110, ¶ 57.

- 13 -

A successful claim of ineffective assistance of counsel requires a defendant to show both (1) counsel's performance was deficient and (2) the deficient performance resulted in prejudice to the defendant. *Id.*

¶ 58 "To establish deficient performance, a defendant must show that his attorney's performance fell below an objective standard of reasonableness." *People v. Bates*, 2018 IL App (4th) 160255, ¶ 47. We employ a highly deferential assessment of counsel's performance on review. *Id.* To that end, a defendant "must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy," which includes decisions such as what matters to object to. *Id.* Strategic choices by counsel are " 'virtually unchallengeable.' " *Id.* (quoting *People v. Manning*, 241 Ill. 2d 319, 333 (2011)).

¶ 59 A defendant establishes prejudice by showing that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *Id.* ¶ 48.

¶ 60 We review *de novo* whether a defendant received ineffective assistance of counsel. *People v. Gittings*, 2025 IL App (4th) 241445, ¶ 54.

¶ 61                                    2. *This Case*

¶ 62 In this case, the trial court granted the State an extension of the speedy-trial term pursuant to section 103-5(c) on January 12, 2023. On that date, 95 days had already elapsed. The court found that the State had exercised due diligence in procuring the DNA testing. However, defendant contends the court's finding was an abuse of discretion. Specifically, defendant argues the court never addressed (1) why the State waited over a month after the preliminary hearing to swab the firearm for DNA and (2) why the State waited over three months to seek a DNA sample from defendant when it knew that (a) the purpose of DNA testing would be to compare his DNA to any DNA found on the firearm and (b) his DNA was already on file in its own system.

¶ 63 Because we disagree that the trial court abused its discretion by finding the State exercised due diligence in procuring the DNA testing, defendant's ineffective assistance claim likewise fails.

¶ 64 Defendant cites *People v. Battles*, 311 Ill. App. 3d 991, 1002 (2000), in support of his argument that the State failed to meet its burden by adequately explaining the delays in obtaining the DNA evidence. However, this court has declined to adopt the Fifth District's approach in *Battles*, which requires the State to follow a specific series of steps before getting a continuance for DNA testing. *Id.* at 998. Instead, we apply the established rule that courts determine due diligence on a case-by-case basis. See *People v. Colson*, 339 Ill. App. 3d 1039, 1048 (2003).

¶ 65 The record in this case shows the State requested testing shortly after the preliminary hearing, within a week of defendant's arrest. Although there was about a month's delay between that request and the crime scene investigator's swabbing of the firearm, nothing in the record suggests that delay occurred because of a lack of diligence in obtaining the DNA evidence on the part of the State.

¶ 66 Regarding the delay in obtaining defendant's DNA sample for comparison, at the hearing on the motion for an extension of the speedy-trial term, the State explained the lab required a determination of whether a suitable profile existed on the gun before requesting a comparison sample. Once the lab confirmed DNA was present, the State promptly moved for the extension and sought defendant's buccal swab. The State explained that the forensic scientist (1) had advised that the sample from the firearm took around 30 to 60 days to process and (2) around the 60-day mark, the day before the pretrial hearing, the scientist had told the State that the testing was almost complete. At that point, the State requested (1) an order compelling a DNA sample from defendant

- 15 -

and (2) a 50-day extension of the speedy-trial term to process and compare that sample to the DNA obtained from the gun, which the scientist said would take a minimum of 30 days. That request for an order compelling defendant's buccal swab was made only 95 days after the speedy-trial term began.

¶ 67    Despite defendant's claims to the contrary, the present case is not so different from the facts of *Colson*, in which this court held the trial court did not abuse its discretion by finding the State acted with due diligence in obtaining DNA test results. *Id.* There, the crime lab did not receive the sexual assault evidence kit for the defendant's alleged crime and the defendant's blood sample until nearly two months after the defendant's arrest. *Id.* The crime lab received the victim's boyfriend's blood for DNA analysis around a month after it received the kit and the defendant's blood sample, and the lab completed the DNA testing four months after the defendant's arrest. *Id.* This court found that "[t]he State did not delay excessively in getting the DNA materials to the lab" and "[t]he lab did not take an excessively long time in getting the results processed." *Id.*

¶ 68    As in *Colson*, the delay in this case does not show a lack of due diligence by the State. First, the one-month period between the recovery of the firearm and the collection of the DNA swab is not unreasonable on its face. Second, the State acted reasonably when it waited for confirmation that the gun yielded a suitable DNA profile before requesting a standard from defendant. If the laboratory could not extract a suitable sample from the gun, the State would have no need to obtain defendant's DNA. To request a known sample before establishing that necessity does not promote efficiency and risks wasting valuable State resources collecting and processing the sample. Deciding to wait to determine if these administrative steps are necessary before taking them—particularly when they could easily prove needless—is a reasonable course of action.

¶ 69    Ultimately, due diligence need not mean perfect diligence. *Id.* at 1047-48. The trial

court is in the best position to determine whether the State's efforts were reasonable under the circumstances. Here, the court found the State exercised due diligence, and the extension was statutorily authorized. Because the extension was proper, a motion to dismiss on speedy-trial grounds would have been meritless. Accordingly, defense counsel was not ineffective for failing to pursue a futile motion.

¶ 70                                    B. Defendant's Fitness To Stand Trial

¶ 71        Defendant next argues the trial court erred by finding him fit to stand trial at the retrospective fitness hearing. He contends the judge did not actually recall the case—as evidenced by the judge's initial misstatement that defendant had pleaded guilty—and essentially "rubber-stamped" the expert's opinion. We disagree.

¶ 72                                    1. *The Applicable Law and the Standard of Review*

¶ 73        A defendant is presumed fit to stand trial. 725 ILCS 5/104-10 (West 2024). A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. *Id.* Fitness refers only to a defendant's ability to function within the context of a trial; it does not refer to competence in other areas. See *People v. Stahl*, 2014 IL 115804, ¶¶ 27-28 (distinguishing fitness from general mental health). We will reverse a trial court's ruling on fitness only if it is against the manifest weight of the evidence. *People v. Haynes*, 174 Ill. 2d 204, 226 (1996).

¶ 74                                    2. *This Case*

¶ 75        The record shows that the trial court conducted a full evidentiary hearing at which it considered Lohr's testimony. Lohr testified that at the time of trial and sentencing, defendant was oriented to time and place, understood the charges, and was capable of assisting counsel. She specifically addressed reports that defendant was hearing voices, explaining that they did not

disrupt his thought process and appeared rooted in the reality of his dangerous living environment.

¶ 76        The trial court's independent finding of fitness was based on this uncontradicted expert testimony and the court's own observations. Although defendant points to the judge's minor recollection error regarding the mode of conviction—which counsel immediately corrected and the court acknowledged—this mistake does not negate the substantive finding. Just because the court made a slip of the tongue when stating its recollection does not mean it failed to actually remember the proceedings once reminded. Accordingly, we conclude that despite this misstatement, no basis exists to reject the trial court's findings, which were supported by the only expert evidence presented.

¶ 77        Furthermore, although defendant points to his own unusual behavior, such as wearing a protective smock, such behavior does not preclude a finding of fitness. Even if defendant were suffering from a mental health condition, mental illness does not necessarily render a person unfit to stand trial. As noted in *People v. Finlaw*, 2023 IL App (4th) 220797, ¶ 65, a diagnosis of mental illness does not in itself render a defendant unfit. Being fit does not require the absence of mental health problems, and there is no reason that hearing voices should render someone unfit as a matter of law, as defendant implies.

¶ 78        Defendant nonetheless argues that the trial court erred by relying on the expert's opinion, characterizing the expert's conclusions as poorly reasoned and contradicted by the record. However, defendant does not identify exactly how he believes the opinion was contrary to the record, and he had the opportunity to test that opinion at the retrospective fitness hearing or provide his own expert. The court gave the expert's opinion the weight it believed was deserved. Briefly, beyond misstating that the case involved a guilty plea, nothing in the record suggests that the trial court failed to form its own opinion by giving great weight to the expert's testimony.

¶ 79            Finally, although the trial court previously noted defendant seemed "a little bit detached" at sentencing, the court also expressly stated at that time that defendant understood what was going on around him. Bizarre or detached behavior does not automatically render a defendant unfit. The expert evidence from April 2023 indicated defendant was fit, and the court properly relied on that evidence to cure the prior procedural error. The court had the opportunity to observe defendant before the trial and was the same judge presiding over the retroactive fitness hearing on remand. Aside from one minor speaking error, the record shows the court made an independent analysis of fitness, and it was entirely appropriate for the court to give substantial weight to the expert's testimony.

¶ 80                                   C. Sentencing

¶ 81            Defendant next argues his 12-year sentence for AHC was (1) excessive and (2) the product of an improper double enhancement. He contends the trial court improperly considered his prior felonies and the "threat of serious harm" as aggravating factors. We disagree.

¶ 82                       1. *The Standard of Review and Applicable Law*

¶ 83            The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A reasoned judgment regarding the proper sentence must rest on the particular circumstances of each case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 102. A trial court has discretion to determine which of the four purposes of sentencing—retribution, deterrence, incapacitation, and rehabilitation—predominates in a given case. *People v. Page*, 2022 IL App (4th) 210374, ¶ 52.

¶ 84        "A reviewing court gives substantial deference to the trial court's sentencing decision because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. We strongly presume the trial court based its sentencing determination on proper legal reasoning, and we consider the record as a whole, rather than focusing on a few words or statements by the trial court. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 64.

¶ 85        A statutorily authorized sentence is presumptively proper, and we may not disturb the trial court's evaluation of proper factors absent an abuse of discretion. *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 56. "A trial court's sentence is an abuse of discretion if it is greatly at odds with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Id.*

¶ 86        Section 5-5-3.2(a)(1) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-5-3.2(a)(1) (West 2024)) permits a trial court to consider, as an aggravating factor in sentencing, that a defendant's conduct "caused or threatened serious harm." "However, it is improper for a court to rely on this factor when the causing of serious harm is inherent in the offense." *People v. Reyes*, 2025 IL App (2d) 210423-B, ¶ 49. This practice, known as a double enhancement, occurs when a single factor is used both as an element of an offense and as a basis for imposing a harsher sentence, or when the same factor is used twice to elevate the severity of the offense itself. *Id.* (citing *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004)).

¶ 87        Defendant bears the burden of affirmatively establishing the trial court based the sentence on an improper factor. *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18.

¶ 88                            2. *This Case*

¶ 89          Defendant acknowledges he forfeited his sentencing claims by failing to raise them in a postsentencing motion but contends we should review them as a matter of first-prong plain error or ineffective assistance of counsel. Specifically, defendant argues (1) his 12-year sentence was excessive, (2) the trial court subjected him to an improper double enhancement, and (3) we should affirm his 18-month term of mandatory supervised release (MSR).

¶ 90          We disagree. Defendant's first two arguments fail because the trial court committed no error, meaning he cannot establish plain error or ineffective assistance of counsel. His third argument fails because the trial court had no authority to order an 18-month term of MSR, which we will order corrected.

¶ 91                              a. Defendant's Excessive Sentence Claim

¶ 92          First, defendant argues his sentence was excessive and that the trial court failed to properly weigh his rehabilitative potential, his tumultuous upbringing, and his claim of self-defense against the aggravating factors. We disagree because the record shows the court properly considered all appropriate aggravating and mitigating factors. A reviewing court affords great deference to a trial court's sentencing judgment because, having observed defendant and the proceedings, it is in a far better position to consider factors such as credibility, demeanor, and general moral character than a reviewing court relying on a cold record. *People v. Little*, 2011 IL App (4th) 090787, ¶ 24.

¶ 93          Regarding defendant's assertion that his sentence was excessive because of the evidence that he used the firearm in self-defense, we emphasize that a felon with multiple felony convictions has no right to possess a firearm, let alone use it for self-defense. The offense of AHC requires merely that the State prove defendant possessed a firearm and was a convicted felon. Accordingly, any additional aggravating actions defendant took using that firearm are in

- 21 -

addition to the offense itself. Defendant's firing the weapon at other people was an aggravating factor that the trial court could properly consider in sentencing defendant because he had no right to its possession in the first place.

¶ 94　　　In *People v. Hibbler*, 2019 IL App (4th) 160897, ¶¶ 70-71, this court explained that any conduct beyond the minimum necessary to commit the offense is entirely appropriate for a sentencing court to consider. We noted that a defendant pointing a gun directly at a store clerk clearly created a threat of harm much greater than the minimal threat necessary to simply commit the bare offense of armed robbery. *Id.* ¶ 70. Illinois courts have repeatedly held that a judge may consider as an aggravating factor that a defendant's conduct threatened serious harm. *Id.* Examples of such an aggravating factor include an armed robber who actually fires his weapon during the offense or an armed robber who pulls the trigger, but the gun fails to fire. *Id.* We concluded that anything and everything beyond the minimum conduct necessary for a defendant to be found to have engaged in criminal behavior is entirely appropriate for a sentencing court to consider. *Id.* ¶ 71.

¶ 95　　　Here, the trial court appropriately considered defendant's conduct of firing the weapon, which he had no right to possess, in the direction of others, threatening serious harm. Defendant was not entitled to have his use of the weapon mitigate his sentence. Further, defendant complains the court entirely ignored his tumultuous upbringing. However, the court explicitly stated it considered the PSI, which included his family history. Although defendant claims he showed rehabilitative potential, his lack of rehabilitative potential was demonstrated by his additional violent offense during his time in jail, when he attempted to escape and punched a female correctional officer in the face. Further, the record demonstrates the court rejected the State's argument for consecutive sentences, showing that defendant's argument for mitigation bore

at least some success. Ultimately, defendant's 12-year sentence falls well within the statutory range for a Class X felony, which is between 6 and 30 years in prison. 720 ILCS 5/24-1.7(b) (West 2022); 730 ILCS 5/5-4.5-25(a) (West 2022). For these reasons, the 12-year sentence was not an abuse of discretion.

¶ 96    Because the trial court did not abuse its discretion, the court committed no error, and defendant's plain error claim fails. See *People v. Johnson*, 2024 IL 130191, ¶ 44 (noting the usual first step in a plain error analysis is determining whether an error occurred because without error, there can be no plain error). Likewise, defendant's ineffective assistance of counsel claim fails because no reasonable probability exists that the trial court would have altered its sentence had defense counsel raised the excessive-sentence issue. See *People v. Williams*, 2024 IL 127304, ¶ 22 (noting counsel is not ineffective for failing to raise a fruitless argument).

¶ 97                          b. Defendant's Double Enhancement Claim

¶ 98    Second, defendant argues the trial court committed an improper double enhancement by considering his predicate offenses in aggravation. We disagree.

¶ 99    Generally, a single factor may not be used both as an element of the crime and as an aggravating factor justifying a harsher sentence. *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992). In this case, defendant's prior convictions for aggravated unlawful use of a weapon served as predicate offenses for the AHC conviction. See 720 ILCS 5/24-1.7(a)(2) (West 2022).

¶ 100    Although defendant suggests the trial court effectively subjected him to a double enhancement, he overstates the court's remarks. Regarding criminal history, the court simply stated, "So, there was some threatened harm and serious harm in this matter, and the Court also considered the history of prior criminal acts and also the deterrence of others." This statement alone does not demonstrate the court did anything other than consider defendant's general criminal

history, which included multiple other offenses and infractions beyond the predicate felonies. See *People v. Wade*, 2025 IL App (1st) 231683, ¶¶ 66-67 (rejecting the defendant's claim that the trial court's reference to predicate felonies demonstrated double enhancement). Because a trial court is presumed to have followed the law and applied it correctly, we presume the court considered only the history that was proper for aggravation and not defendant's predicate offenses. Accordingly, we conclude that the trial court's vague reference to defendant's criminal history did not represented an improper double enhancement.

¶ 101                    c. Defendant's Mandatory Supervised Release Claim

¶ 102          Finally, defendant notes that the Illinois Department of Corrections has imposed a 3-year term of MSR, which conflicts with the 18-month term the trial court imposed in its sentencing order. Accordingly, defendant asks this court to enforce the 18-month term. However, we decline to do so because, despite the trial court's stating defendant's MSR term was 18 months, the actual term of MSR was 3 years as a matter of law, which the trial court had no discretion to alter. Although defendant requests that we enforce the trial court's written order, a three-year term of MSR automatically attached by operation of law for a Class X felony. See *Round v. Lamb*, 2017 IL 122271, ¶ 16 (noting the MSR term is included in the sentence as a matter of law and the failure to include the term in the written sentencing order does not invalidate the sentence). Under section 5-4.5-25(l) of the Unified Code (730 ILCS 5/5-4.5-25(l) (West 2024)), the term must be three years upon release from imprisonment.

¶ 103          The First District addressed a similar situation in *People v. Viverette*, 2016 IL App (1st) 122954, in which the trial court failed to impose a term of MSR in its sentencing order. The appellate court concluded that despite the court's failure to include the term, because that term was a mandatory component of the defendant's sentence, its omission from the order did not negate

the term in any way. *Id.* ¶ 24. Accordingly, pursuant to its authority under Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967), the appellate court ordered the clerk of the circuit court to correct the sentencing judgment to reflect a three-year term of MSR. *Id.* ¶ 25.

¶ 104　　　　　Although the present case presents a slightly different issue—namely, the trial court explicitly ordered an 18-month term instead of simply omitting the term entirely from its sentence—we conclude defendant is not entitled to have that erroneous term enforced. The three-year term of MSR attached by operation of law the moment the trial court sentenced defendant to a prison term.

¶ 105　　　　　Defendant cites *People v. Castleberry*, 2015 IL 116916, ¶¶ 26-27, and argues a reviewing court cannot correct a nonconforming sentence on direct review to increase a defendant's punishment. However, ordering the clerk of the circuit court to correct the judgment to reflect a three-year term of MSR does not alter defendant's sentence. Instead, that correction merely reflects the statutory reality that defendant's MSR term was three years the moment the trial court sentenced him to prison. Accordingly, like in *Viverette*, we order the clerk of the circuit court to correct the sentencing judgment to reflect a three-year term of MSR pursuant Rule 615(b)(1).

¶ 106　　　　　　　　　　D. Constitutionality of the AHC Statute

¶ 107　　　　　Last, defendant argues that the AHC statute violates the second amendment to the United States Constitution both facially and as applied to him under the test set forth in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022), because there is no historical analogue restricting felons' right to possess a gun. We disagree.

¶ 108　　　　　The second amendment to the United States Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and

bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court has recognized that the second and fourteenth amendments (U.S. Const., amends. II, XIV) "protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense," as well as "an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 8-10 (2022) (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010)).

¶ 109 Since *Bruen*, Illinois courts have consistently rejected constitutional challenges like the one defendant raises here regarding regulating firearm possession by felons. In *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21, this court held that "*Bruen*'s historical-tradition test" applied solely to regulations affecting the possession of firearms by law-abiding citizens and stated as follows:

> "As a felon, [the] defendant, by definition, is not a law-abiding citizen. Thus, [the] defendant cannot show that his conduct was presumptively protected by the second amendment [(the first *Bruen* step)], and therefore, he does not fall within the scope of *Bruen*. As a result, [the] defendant cannot show that [the UPWF statute] violates the second amendment on its face under the *Bruen* framework."

See *People v. Hightower*, 2025 IL App (4th) 241235-U, ¶ 35 (holding the UPWF statute (720 ILCS 5/24-1.1(a) (West 2020)) does not violate the second amendment to the United States Constitution either on its face or as applied to the defendant); *People v. Cadengo*, 2025 IL App (4th) 240568, ¶ 72 ("Because of defendant's felony conviction, she is not a 'law-abiding citizen,' so the second amendment's guarantees to do not apply to her. The trial court's order disarming her pursuant to section 5-6-3(a)(9) [(730 ILCS 5/5-6-3(a)(9) (West 2022))] therefore did not violate the second amendment."); *People v. Gardner*, 2024 IL App (4th) 230443, ¶ 68 (upholding the

constitutionality of the UPWF statute (720 ILCS 5/24-1.1(a) (West 2022)).

¶ 110     Here, it is undisputed that defendant has felony convictions; indeed, defendant himself stipulated to the existence of two of them at trial. Accordingly, defendant is not a law-abiding citizen and does not fall within the scope of *Bruen*.

¶ 111     More importantly, we will not depart from our established precedent holding the statute is constitutional. See *Burns*, 2024 IL App (4th) 230428, ¶ 21 (holding a felon's possession of a firearm is not conduct protected by the second amendment); *People v. Leonard*, 2024 IL App (4th) 230413-U, ¶ 15 (same); *People v. Boyce*, 2023 IL App (4th) 221113-U, ¶ 16 (same); *People v. Langston*, 2023 IL App (4th) 230162-U, ¶ 19 (same).

¶ 112                          III. CONCLUSION

¶ 113     For the reasons stated, we affirm as modified to reflect a three-year term of mandatory supervised release, and we remand for issuance of an amended judgment of sentence so reflecting.

¶ 114     Affirmed as modified; cause remanded with directions.